|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Civil No. 07-0448 (JAF) |
| v. | |
| RAMON ZORRILLA-ECHEVARRIA, | |
| Defendant. | |
| ANDRES CASTILLO-PEÑA, | |
| Claimant. | |

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

**O R D E R**

On remand by order of the U.S. Court of Appeals for the First Circuit, (Docket No. 116), there remain pending before this court several motions (Docket Nos. 120; 121; 122; 124) regarding the enforcement of this court's money judgment order of forfeiture against Ramón Zorrilla-Echevarría ("Zorrilla") in the amount of $543,731 (Docket No. 106).

On October 5, 2007, U.S. Customs and Border Patrol ("CBP") seized approximately $541,801 in undeclared currency ("the seized cash"), hidden inside two doors checked by Zorrilla as luggage on a ferry bound for the Dominican Republic. (Docket No. 116 at 2.) On May 27, 2008, a jury found Zorrilla guilty of knowingly and wilfully transporting the cash without reporting the amount in violation of 31 U.S.C. § 5316(a)(1)(A) and (b), as well as bulk cash smuggling in violation of 31 U.S.C. § 5332. (Docket No. 73.) The amended judgment

included a final order of forfeiture in the amount of $543,731 (See Docket Nos. 104; 106).[1]

After his conviction, Castillo-Peña ("Castillo"), a third-party claimant, filed a petition seeking an ancillary hearing, claiming that he was the rightful owner of $343,000, a portion of the seized cash.[2] (Docket No. 70.) We denied this petition (Docket No. 78), and our Final Order of Forfeiture provided that "the cash in the amount of $543,731.00 previously seized and in the Government's possession will be used to fulfill the money judgment." (Docket No. 115.) The First Circuit affirmed the money judgment of forfeiture on appeal. (See Docket No. 116.)

Normally, "no ancillary proceeding is required to the extent that the forfeiture consists of a money judgment." Fed. R. Crim. P. 32.2(c)(1) (2008).[3] Nevertheless, at the government's unopposed suggestion on appeal, the First Circuit vacated our final order of forfeiture to provide Castillo with a hearing and the opportunity to challenge the attachment of the seized cash to satisfy the money judgment against Zorrilla. (See Docket No. 116 at 22.)

On January 23, 2012, we held an evidentiary hearing and listened carefully to the testimony of Zorrilla and Castillo regarding the alleged origins and ownership of the seized cash. (See Docket No. 126.) At the hearing, both men testified that they worked in construction contracting and subcontracting. Zorrilla testified that he had known Castillo, who sometimes referred him construction contracts and jobs, since 1997. (Evidentiary Hr'g Tr., January 23,

---

[1] The First Circuit's opinion summarizes the procedural saga of this case in greater detail. (See Docket No. 116 at 1–8.)

[2] Zorrilla also filed such a petition, (Docket No. 69) but, as explained by the First Circuit, (Docket No. 116) only Castillo concerns us on remand.

[3] As noted by the First Circuit, the 2008 version of Federal Rule of Criminal Procedure 32.2 controls here; the 2009 amendment to the rule occurred after the original entry of judgment in this case. (Docket No. 116 at 9.)

2012, at 30.) Zorrilla testified that although he had a bank account, he did not use it for savings and, instead, saved cash from his construction work, until he accumulated "a little over 270 thousand or something."[4] (Id. at 31.)

Castillo testified that he had worked as a contractor in painting and minor construction for eighteen years. (Id. at 54.) He rents his home, and has never owned his own home. (Docket No. 56.) He testified that, over the course of eight or nine years, he saved leftover money from cashed checks from construction in a safe in his closet until he accumulated "$343,000 in cash."[5] Although he presented his documentation of the income tax he paid to the Puerto Rico Department of the Treasury from 2005–2007, none of the documents mention his cash savings or the $343,000.[6] (Id. at 59.)

Castillo testified that Zorrilla was his "man of trust" and had known him since 1997, when they met playing pool. (Id. at 46, 50.) The pair both testified that they made plans to pool their impressive secret cash savings to purchase a concrete block company in the Dominican Republic with the goal of buying, renovating, and reselling homes there. (Id. at 31; 50.) Neither could recall the name of the concrete block company they planned to purchase. Castillo

---

[4] Q. When the government inquired about the portion of the seized cash made up of "1,550 dollars in one dollar bills" and the "648 bills that were five dollar bills," Zorrilla responded that [s]ometimes they give it to me in five dollar bills, and I just put it away." (Docket No. 128 at 37.) When the government questioned whether it was "usual to be paid in one, [five, or ten] dollar denominations" for jobs, "People pay you with what they have," Zorrilla answered. (Id.) When asked about cash that he claimed came from cashed checks, he used an example of a $5,000 check that he might cash, stating that he'd get cash in return in an "envelope or paper bag" and claimed that the bank sometimes gave him one dollar bills, "but not always;" other times they gave him "five, ten dollar bills" when he cashed such a large check. (Id. at 38.)

[5] Castillo explained: "like they say, I would have a little piggy bank, and I would stuff [the cash] in there." (Id. at 56.)

[6] Zorrilla did not report any of the cash on his income tax returns either. (Docket No. 128 at 36.)

1  claimed that it took him about six hours to count his portion of the cash. (Id. at 57.) The pair

2  both testified that Zorrilla came to Castillo's house in Trujillo Alto, and Castillo gave him the

3  money, in cash. (Id. at 41; 56.) Castillo testified that Zorrilla did not give him any details on

4  how he planned to travel to the Dominican Republic. (Id. at 61.) He also claims he did not get

5  a receipt from Zorrilla because they had already discussed the alleged business plan. (Id. at 57;

6  59.) Because of this, he admitted that he did not know how much of the seized cash was made

7  up of the cash he allegedly gave Zorrilla. (Id. at 60.)

8      Zorrilla also testified that the pair pooled their savings to follow the alleged business

9  plan. He testified that he told Castillo that he would transport the money to the Dominican

10 Republic, but claimed Castillo never inquired into the date or manner of the transportation. (Id.

11 at 56.) Zorrilla claimed he failed to declare the money and hid it inside the doors because "most

12 of the time when people know that you have a lot of money, they kill you" and he did not want

13 to get robbed and killed. (Id. at 32.) Confronted with statements he made to CBP at the time

14 of his arrest, in which he stated that a man named Orlando Martínez had offered—and then

15 given—him $500 to transport the entire amount of seized cash to the Dominican Republic,

16 Zorrilla testified that he had lied to CBP and invented the whole story—including the name and

17 physical description of the man—out of fear because he did not want to go to jail. (Id. at 67.)

18     Based on their inconsistent testimony, courtroom demeanor, and impeachment by the

19 government during cross-examination, we find Zorrilla and Castillo utterly lacking credibility,

20 and their tale comically unbelievable. Given the quantity of cash involved, we find it dubious

21 that the pair failed to create any receipts or documents regarding the venture. Moreover,

legitimate entrepreneurs do not normally attempt to smuggle their startup capital abroad in the form of a large quantity of cash (accumulated in a "piggy bank" hidden in the closet, with bills of various denominations, and unreported on tax returns) hidden inside doors on ferries. Now that we have heard—and rejected—Castillo's claims regarding his alleged ownership of a portion of the seized cash, we turn to enforcement of the money judgment.[7]

The government urges us to employ 21 U.S.C. § 853(p), which permits the forfeiture of substitute assets to satisfy a money judgment in certain situations described in the statute, arguing that the seized cash has been deposited with a third party—CBP—as described in § 853(p)(1)(B). (Docket No. 123 at 2.) Zorrilla and Castillo argue that the government has failed to properly "pursue either the civil or criminal forfeiture of the defendant currency" and, therefore, cannot pursue forfeiture now. (Docket No. 121 at 3.)

We disagree and find the government's position persuasive.[8] The valid money judgment issued as part of the forfeiture order (and affirmed by the Court of Appeals) "can be used in the future to seek forfeiture of substitute assets by court order under § 853(p) and Rule 32.2, even where the government has not expressed an intent to do so at any time before it seeks such an order." United States v. Misla-Aldarondo, 478 F.3d 52, 75 (1st Cir. 2007). The government has met its burden of compliance with § 853(p) by showing that, as a result of Defendant's act

---

[7] As the First Circuit noted, we have no need to assess the interests of any other third parties, since publication of the forfeiture has already taken place and no other claimants emerged to contest it. (Docket No. 116 at 22 n.14.)

[8] The First Circuit has noted, but not decided, the issue of whether a money judgment can be enforced without using the substitute-assets' provision of § 853(p). Misla-Aldarondo, 478 F.3d at 75. We will not try to force them to answer the question now.

or omission, the seized cash was "transferred or sold to, or deposited with, a third party," namely CBP.[9] Id. at 74 (citing § 853(p)(1)(B)); see also United States v. Candelaria-Silva, 166 F.3d 19, 42 (1st Cir. 1999) ("To obtain an order forfeiting property as a substitute asset, the government need only comply with the requirements of § 853(p).").

In accordance with the above, we hereby **DENY** Castillo's "Third-Party Claimant's Renewal Motion for Return of Property." (Docket Nos. 120; 122.) We hereby **GRANT** the government's motion for forfeiture. (Docket No. 123.) We hereby **ORDER**, in accordance with the provisions of 21 U.S.C. § 853(p) and Rule 32.2(e) of the Federal Rules of Criminal Procedure, that the seized cash in the amount of $543,731, currently in the custody of CBP, shall be used to fulfill our valid money judgment against Zorrilla (Docket Nos. 115; 116).

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 2nd day of February, 2012.

                                          s/José Antonio Fusté
                                          JOSE ANTONIO FUSTE
                                          U.S. District Judge

---

[9] Defendant and Claimant argue at length that the government has failed to meet its burden under § 853(p)(1) by failing to show that the money was unavailable because the government knew its location and, therefore, could have located it with due diligence. (Docket No. 124 at 3–5.) Unfortunately for them, § 853(p)(1) is written in the disjunctive, meaning that an inability to locate the property upon the exercise of due diligence is not required; deposit of the property with a third party under § 853(p)(1)(B) is sufficient to trigger the substitute-asset provision.